LILLY *v.* STATE

[No. 106, October Term, 1956.]

*Decided March 6, 1957.*

The cause was argued before Brune, C. J., and Collins, Henderson, Hammond and Prescott, JJ.

*Louis Samuels,* with whom were *Samuel A. Culotta* and *Malcolm J. Coan* on the brief, for the appellant.

438

The Court declined to hear argument for the appellee.

*C. Ferdinand Sybert, Attorney General, Alexander Harvey, II, Assistant Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *Julius A. Romano, Assistant State's Attorney,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment and sentence on an indictment charging the defendant with manslaughter by automobile. The case was tried by the trial judge without a jury on April 16, 1956.

The case arose out of a collision on December 9, 1955, at about 3:30 A. M. in the intersection of Eastern Avenue, which runs east and west, and Bouldin Street, which runs north and south, public highways of Baltimore City. The defendant, Scotty S. Lilly, was driving his Plymouth automobile in a southerly direction on Bouldin Street, 30 feet in width, and a bus of the Baltimore Transit Company, operated by James Barroll, was traveling eastward on Eastern Avenue, 42 feet wide. They collided at the intersection, as a result of which Edgar Lechliter, aged nineteen, a passenger riding on the right hand side of the front seat of the Plymouth, was killed. Eastern Avenue was a favored street with stop signs facing traffic traveling north and south on Bouldin Street. As a result of the collision both the bus and the automobile came to rest at the southeast corner of the intersection. The automobile stopped wholly on the sidewalk and the front of the bus stopped with a Baltimore Transit Company utility pole imbedded in its left front fender. From the pictures taken at the scene and offered in evidence, the Plymouth was extensively damaged on its front and right side and the bus was damaged on its left front and along its left front side. Another photograph taken at the scene shows both vehicles standing on the southeast corner, parallel and facing to the southeast.

After the accident Lechliter was unconscious and was removed from the right front seat of the automobile to the hospital, where he died forty minutes later of injuries sus-

tained in the collision. A blood vessel had ruptured because it had been subjected to severe force. The defendant, the owner and driver of the Plymouth, was also injured and taken to the hospital where he was treated for concussion, a possible leg fracture, and lacerations of the face. Six of the bus passengers and the driver, who had been pinned in the bus, were also injured.

At the trial of the case the attorney for the State stated that Barroll was unable to testify. According to the statement he gave to the police all he knew was that he was beginning to cross Bouldin Street and all of a sudden he heard a noise. He was injured and lost control of the bus.

Officer Milton Skalinski testified that he arrived at the scene of the accident about 3:46 A. M. in company with Officer Schmidt. The bus and automobile had not been moved. The bus had been traveling east on Eastern Avenue, the favored street. Bouldin Street was controlled by boulevard stop signs. The Plymouth was southbound on Bouldin Street. The speed limit was twenty-five miles per hour there. There were no signals other than the stationary stop signs. He testified from a photograph offered in evidence that the bus stopped at the southeast corner of Eastern Avenue and Bouldin Street, lodged against the pole at that corner, with damages to the left front. The pole was located 13 feet south of the south curb at the east side of Bouldin Street. The passenger car was up on the southeast pavement. The officer talked to Lilly at the hospital, in the presence of Officer Schmidt, and stated that Lilly said: "I was going home with my buddy. I don't know where I had been, out drinking. Give me a shot for my leg and I will tell you." Lilly at that time was suffering with a possible fractured leg and a concussion and lacerations of the forehead. The person to whom he referred as "my buddy" was Lechliter. When asked, when talking to Lilly, whether he was in a position to observe whether he had been drinking or not, the officer replied: "We smelled the odor of alcohol on Mr. Lilly's breath during the conversation." He got permission from Lilly to obtain a blood sample and an analysis of alcohol. When asked whether he had a report or finding of the blood

test, he replied that he had such a report made by Dr. Henry C. Freimuth. At that point counsel for the defendant stated: "It shows that the man was not under the influence of liquor. I thought we had agreed on it." The attorney for the State then said: "That is true. We are not contending he was operating under the influence of liquor." When asked what was the result of the test, the officer read from the report: "The result of the examination showed the blood of the above subject contained 0.11% ethyl alcohol. Blood consumed during test." From other testimony it appears that the intoxication point is 0.15%. The weather was clear, the street dry, and the illumination good. On cross examination the officer said there was damage to the left front of the bus on the driver's side and "around the driver's side to the left side". The right front of the passenger car struck the bus. The passenger car and the bus met at right angles, 12 feet east of the west curb of Bouldin Street, and 22 feet south of the north curb of Eastern Avenue. He did not check the speedometers.

Sergeant Trainor testified that Lilly said he was carrying his buddy home and he did not know what happened. Lilly had been drinking and did not know where he had the accident nor where he had been. He could smell alcohol on his breath. He asked Lilly: "Don't you know better than to drink and drive?" and Lilly replied "that his wife don't want him to drink but he drinks anyway; he does not know any better." The Sergeant made another trip back to the hospital and at that time Lilly told him: "I am not telling you anything."

Dr. Charles Wheeler testified that he performed an autopsy on Edgar Lechliter and found that he had died from a tear in the major vein which returns blood to the heart from the abdominal organs. There was also a tear in the diaphram. There were also contusions, abrasions and lacerations, and both of his thighs were fractured. An examination was made of the alcoholic content of the deceased's blood and it showed 0.16% alcohol, which would be one point past intoxication.

Mr. James H. Vincent, testifying for the State, said he had

been a chauffeur for about fifteen years and was a passenger on the Baltimore Transit Company bus on December 9, 1955, at or near the intersection of Eastern Avenue and Bouldin Street. He was sitting opposite the rear exit door on the left side behind the driver. The bus was traveling east on Eastern Avenue. When it reached Bouldin Street the front of the bus passed the curb and "was getting up into the center of Bouldin Street". He then saw the car from his left flash by going south on Bouldin Street and run into the bus. It did not stop at the intersection. When he first saw the car the bus was about in the middle of both streets. He saw it as soon as it flashed around the corner. The car came out into the intersection and the next thing he knew it rammed the bus. He estimated that the speed of the car "would be between 50 and 60 miles per hour". On cross examination he stated that he was looking out of the window to his left. He estimated that two or three seconds passed between the time he first saw the automobile and the time it struck the bus. The speed of the car could not have been slower than his estimate. It could possibly have been faster. When asked about the distance a car, traveling at 60 miles per hour, would travel in two seconds, he said this was merely his estimate. He was on the highway every day driving a truck at 45 miles per hour.

The defendant did not testify in the case nor were any witnesses offered in his behalf. A motion was made for a directed verdict which was refused. On appeal here he contends that the evidence was not sufficient to sustain the conviction. Under the Rules of Practice and Procedure, Part IV, Criminal Rules of Practice and Procedure, Rule 7 (c), of this Court (now Rule 741 c, of the *Maryland Rules*), this Court reviews upon both the law and the evidence but the judgment of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. This rule has been stated many times by this Court.

Code, 1951, Article 27, Section 455, provides in part that every person causing the death of another as a result of the

operation or control of an automobile in a grossly negligent manner shall be guilty of a misdemeanor known as manslaughter by automobile. As pointed out in *Clay v. State,* 211 Md. 577, 128 A. 2d 634, there had been three previous cases in this Court involving the aforesaid statute. *Hughes v. State,* 198 Md. 424, 84 A. 2d 419; *Duren v. State,* 203 Md. 584, 102 A. 2d 277; and *Thomas v. State,* 206 Md. 49, 109 A. 2d 909. In those cases we held that gross negligence amounts to a "wanton or reckless disregard for human life".

Code, 1951, Article 66½, Section 198, provides: "(Vehicle Entering Through Highway or Stop Intersection.) (a) The driver of a vehicle shall come to a full stop as required by this Article at the entrance to a through highway and shall yield the right of way to other vehicles approaching on said through highway." By Code, 1951, Article 66½, Section 207, the State Roads Commission or appropriate local authorities are given power and authority to designate through highways and to erect stop signs at specified entrances thereto. Sub-section (c) of that Section provides: "Every driver of a vehicle shall come to a full stop at such sign or at a clearly marked stop line before entering an intersection and yield the right of way to vehicles approaching on the intersecting highway except when directed to proceed by a peace officer or traffic control signal." These statutory provisions have been reviewed many times by this Court and are applicable to collisions between motor vehicles at the intersection of through highways. The rules applicable thereto, as so often stated and applied in recent cases, are clear and positive. The duty of a driver, the unfavored driver, entering a road or street where there is a stop sign is not only to stop but to yield the right of way to the favored driver during his entire passage over the intersection. The favored driver has the right to proceed upon the assumption that the unfavored driver will stop and yield the right of way. The primary purpose of the statute is to speed the growing volume of traffic. It would be very impractical to require the operators of vehicles on the favored way to anticipate infractions of this rule, and to reduce their speed at each intersection. Of course, this does not mean that the favored driver has an

absolute, unqualified and complete right of way at all times and under all circumstances. This right of way, of course, is to be enjoyed under the circumstances there existing. *Fowler v. DeFontes,* 211 Md. 568, 128 A. 2d 395, and cases there cited. There is direct evidence from Mr. Vincent, who was seated on the left side of the bus where the defendant's car could be plainly seen, that the defendant did not stop at the intersection. The trial judge was justified in so finding.

As to intoxication, although the blood test showed that there was not sufficient alcohol in defendant's blood stream to prove that he was intoxicated, and although the State was not contending that he was operating under the influence of liquor, yet the defendant admitted that he had been drinking. In *Clay v. State, supra,* it was held that driving after drinking is a proper matter, with others, for consideration in determining possible gross negligence.

As to speed, in *Duren v. State, supra,* p. 591, Judge Hammond for this Court reviewed many cases and concluded: "It is plain that the environment in which speed is indulged must determine whether it does or does not show gross negligence at a given time. Speed in the open country on a four lane highway may be very high and not constitute negligence. A much lower rate of speed in a city street may constitute gross negligence. This, too, was the law long before automobiles existed. * * * Obviously, what must be looked for in each case is whether, by reason of the speed in the environment, there was a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another. Cf. *Darienzo Trucking Corp. v. Sullivan,* 202 Md. 32, 39-40, 95 A. 2d 293, 296. If there is found such lack of control, whether by reason of speed or otherwise, in a place and at a time when there is constant potentiality of injury as a result, there can be found a wanton and reckless disregard of the rights and lives of others and so, criminal indifference to consequences." Judge Henderson in the dissenting opinion in that case agreed that speed must be weighed in the light of the surrounding circumstances.

Mr. Vincent, on the left side of the bus, the side from

which the defendant came, the street being well illuminated, was in a good position to observe defendant's car. It is an accepted rule of evidence that a witness qualified by observation and experience may testify as to speed of a moving automobile which he has observed, and a person who has become familiar with the operation and speed of automobiles by personal experience is qualified to estimate the rate of speed of automobiles. *Miller v. Graff*, 196 Md. 609, 617, 78 A. 2d 220. Mr. Vincent testified that he had been a chauffeur for fifteen years and was on the highway every day. He saw defendant's car as the front of the bus passed the curb and was getting into the center of the intersection. In his opinion, not having stopped at the stop sign, it was traveling between fifty and sixty miles per hour just before it ran into the bus.

Furthermore, the location of the vehicles after the accident, the damage to the vehicles, and the injuries suffered, corroborate Mr. Vincent's testimony.

The photographs taken at the scene show the bus with its left fender imbedded in the utility pole at the southeast corner of Eastern Avenue and Bouldin Street. The left side of the bus was severely dented. Comparing the size of the bus, and its position after the accident, with the automobile, it is very apparent that the automobile struck the bus on its left hand side with such force that it changed the direction of the bus by over forty-five degrees. The photographs of the Plymouth automobile show that practically the whole front part was reduced to junk and the right front fender was pushed back to the windshield. The right front headlight was missing. Very little glass was left in the windshield and in the right front door. The Plymouth also seemed to be more or less buckled in the middle, indicating that it must have hit the bus with terrific force. There was ample evidence that the appellant was operating the Plymouth, as he told Sergeant Trainor that he was carrying the deceased home and also that he was operating the car. He was found on the left front seat. He was also the owner of the car.

There was ample evidence from which the trial judge could find that the defendant, who had been drinking, drove his

automobile in the City through a stop sign at excessive speed and crashed into the bus which was on the through street, resulting in the death of his passenger, and that these actions amounted to a wanton and reckless disregard for human life, and constituted manslaughter by automobile.

*Judgment affirmed, with costs.*